STATE v. GUSSIE HAND.

(Filed 17 November, 1915.)

**1. Homicide—Defenses—Reasonable Apprehension—Assault.**

A homicide is not excusable unless it reasonably appeared to the accused that the deceased intended to kill her or her child *in ventre sa mere,* or to do either of them great bodily harm; or that the assault upon her would have resulted in her death, or great bodily harm, or that of her child, the reasonableness of this apprehension being a question for the jury under the evidence; and a homicide is not excused by the fear that a mere assault would be committed by the deceased at the time.

**2. Homicide—Matters in Mitigation—Instructions—Inferences—Questions for Jury.**

Where the accused, on trial for a homicide, relies upon the defense that the act was committed by her with reasonable apprehension of an assault by the deceased, etc., a prayer for instruction which sets forth the testimony relied upon and asks the court to instruct the jury to acquit the accused if such testimony is found by the jury to be true, leaving out of consideration the inferences to be drawn therefrom, is an improper one.

**3. Instructions Requested—Erroneous in Part—Appeal and Error.**

Where a part of a requested instruction is erroneous, it is not error for the trial judge to reject the whole.

**4. Homicide—Deadly Weapon—Malice—Presumptions—Burden of Proof—Instructions.**

The accused, on trial for homicide, has the burden upon him of proving matters in mitigation of the degree of the offense, when the homicide has been shown to have been committed by him with a deadly weapon; and under the circumstances of this case it is held that the trial judge correctly charged the jury that a provocation amounting to an assault would reduce the crime to manslaughter.

**5. Homicide—Malice—Mitigating Facts—Lesser Offenses—Instructions.**

Where if certain facts and circumstances upon a trial for homicide are found by the jury to be true, such as would remove the presumption of malice from the killing with a deadly weapon, a requested instruction predicated thereon, with direction to bring in a verdict of acquittal, should be refused, for the jury may convict of a lesser crime than murder.

**6. Court's Discretion—Judgment Set Aside—Fair Trials—Appeal and Error.**

The granting of motions to set aside a verdict as being contrary to the weight of the evidence, and also to give the accused an opportunity to try his case before an unbiased and unprejudiced jury, rests within the discretion of the trial judge, and is not reviewable on appeal.

**7. Instructions—Evidence—Inferences—Speculation.**

An instruction by the court that the jury should make its decisions upon what the witnesses say, "with proper inference and deduction by the use of your own sense and judgment from what they say or fail to say," is not objectionable on the ground that the jury were told to speculate or imagine what had occurred.

**8. Homicide—Deceased Persons—Evidence.**

One accused of a homicide is not forbidden to testify as to what occurred between the deceased and himself, constituting matters of defense, the rule regulating such evidence in civil actions not applying thereto.

APPEAL by defendant from *Rountree, J.,* at June Term, 1915, of PENDER.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*Bland & Bland, H. McClammy for prisoner.*

CLARK, C. J. The prisoner was indicted for the murder of her brother. She was convicted of manslaughter and sentenced to two years in the State's Prison.

At the time of the homicide the accused and the deceased were living with her father. She was in the kitchen, while the deceased was on the back porch. He was shot with a shotgun, the load entering the neck in front, a little to the left. The testimony of Faybell Graham, a 12-year-old colored girl, who saw the transaction, a little condensed, is as follows: "I saw Pierce Jordan (the deceased) walking up and down the passage in the house, cussing. I was at the pump, as far as from there to the stove (about 18 feet). Miss Gussie fired the shot that killed Mr. Jordan. I saw her pick up the gun. The first time she went to the door she set down the gun and Elizabeth told her not to shoot. She

went back to the table, and it was not long before she went back to the
door, picked up the gun, and shot. Mr. Jordan was out there in the
piazza all the time. She went to shut the door, and pushed him out
and he came near falling, but steadied himself, and she shot him then.
She was standing in the door inside the kitchen when she shot, and he
was on the back piazza, cussing, at the time he was shot. They both
were quarreling that morning when I got there. He was about as far
from her as from here to that table (about 7 feet). She had a breech-
loading gun setting by the kitchen table. Elizabeth was her little girl,
not as big as I am. It was not long after she picked up the gun the
first time and the time she shot. Mr. Jordan fell when she shot him,
right straight down. She ran out to the road and told Miss Lizzie
Jordan that she had killed him; I didn't hear any door burst open or
anybody kick the door. I could see the door from where I was at the
pump. 1 could look right into the window. The door was not kicked
in as I knows of."

The accused pleaded self-defense and attempted to show by the testi-
mony of herself and other witnesses that the deceased had cursed and
threatened to kill her several times; that shortly before the homicide,
and for about 1½ hours, he had been cursing and threatening her while
he was in his room or walking up and down the passage; that she went
in the kitchen and fastened the door, but that he came out to the porch,
kicked open the kitchen door, and stepped across it with a pistol.

There was conflict of testimony as to this. The accused and her
witnesses testified that the kitchen door showed by marks on it, by the
broken latch and by the sprung door-facing, that it had been kicked
open, while the witnesses for the State testified that they saw no marks
on the door; that there was no sign of the latch having been broken,
and the bulge in the door-facing was an old defect; that the facing
had bulged off, and there were spider webs where the facing had stayed
open for a long time; there was no plastering on the floor.

The first prayer for instruction was properly refused, as it was predi-
cated upon the proposition that the killing would be excusable if the
deceased had advanced upon the accused "manifestly intending to com-
mit an assault upon her," and if she had reasonable grounds to believe
"an assault was about to be committed upon her." In order to excuse
the taking of human life it must appear that the accused had reason to
apprehend that the deceased intended to kill her or her child or to do
either of them great bodily harm, or that the assault upon her would
have resulted in her death or great bodily harm, or that of her child.
*S. v. Clark*, 134 N. C., 704; *S. v. Dixon*, 75 N. C., 275. This view was
submitted in the instruction given by the court. A homicide is not
excused by fear that the deceased is about to commit a mere assault.

45—170

The second prayer for instruction was properly refused, for it is well settled that the reasonableness of the apprehension is one of fact for the jury. *S. v. Blevins,* 138 N. C., 668; *S. v. Clark,* 134 N. C., 704.

The third prayer for instruction, while setting out a combination of acts and circumstances in testimony, attempted to withdraw from the jury the ultimate question of fact, whether the apprehension was a reasonable one, and to substitute an instruction that if those facts and circumstances were found to be true the jury should return a verdict of not guilty. If part of a prayer is erroneous, it is not error to reject the whole. *S. v. McDowell,* 145 N. C., 563.

It is well settled law that when the killing with a deadly weapon has been proven or admitted, the burden is on the prisoner to show excuse or mitigation. *S. v. Gaddy,* 166 N. C., 341; *S. v. Yates,* 155 N. C., 450; *S. v. Rowe, ib.,* 436; *S. v. Simonds,* 154 N. C., 197; *S. v. Brittain,* 89 N. C., 481. The court correctly charged the jury that a provocation amounting to an assault would reduce the crime to manslaughter. *S. v. McNeill,* 92 N. C., 812; *S. v. Smith,* 77 N. C., 488.

Assignments of error 4 and 5 are based on the refusal of the court to give the prayers 4 and 5 requested by the accused. In these prayers certain facts and circumstances in testimony are recited, with a request to charge that as a matter of law the presumption of malice would be rebutted and that the jury should return a verdict of not guilty. Even if part of the prayer were correct, that the presumption of malice would be rebutted, yet the instruction to return a verdict of not guilty would not necessarily follow; for while this might mitigate the offense to manslaughter, it would not excuse the homicide. Without malice unlawful homicide is manslaughter. *S. v. Baldwin,* 152 N. C., 822; *S. v. Lance,* 149 N. C., 551; *S. v. Hall,* 132 N. C., 1095; *S. v. Vines,* 93 N. C., 493.

The sixth prayer for instruction was defective, in that the court was requested to charge that certain facts appeared from all the evidence, when there was a clear conflict of testimony in regard to them.

The seventh assignment of error is for the refusal of the court to grant the motion to set aside the verdict upon the ground that it was contrary to the weight of evidence, and the last assignment of error is for the refusal of the court to set aside the verdict in order to give the accused an opportunity to try her case before a jury unbiased and unprejudiced. The granting or refusal of such motions rests in the discretion of the trial judge, and his action thereon is not reviewable. *S. v. Watkins,* 159 N. C., 480; *S. v. Pace, ib.,* 462; *S. v. Hancock,* 151 N. C., 699, and cases cited in these.

Assignments of error 8 and 9 are based upon the instruction of the court that the jury should make its decision "upon what the witnesses say, or what you believe of what they say, with proper inference and deduction by the use of your own sense of judgment from what they say

or fail to say." This cannot be construed to mean that the jury were to speculate or imagine what had occurred. But it was simply committing the case to the jury upon the facts as they should find them to be, with proper inferences and deductions therefrom.

The accused was a woman, and in her father's house. She and the deceased were in a quarrel. There was evidence, if believed, indicating an intention to make an assault upon her. It was further in evidence that her child was born 18 days thereafter. We may well believe that under these circumstances the sympathies of the jury were on her side, and that they did not find that she was justified in killing the deceased with a breech-loading gun shows that the jury did not find any excuse or mitigation that would reduce the homicide to a less degree than manslaughter. The charge of the court was full and fair to her. All that was proper in the prayers was substantially given in the charge. The humane judge who tried the cause refused to set aside the verdict on the alleged ground that it was against the weight of the testimony, and limited the punishment to two years. This may be reduced materially by good conduct, or, if the facts justify it, a part or the whole of the sentence may be remitted, in the judgment of the Executive.

In homicide cases, unlike civil actions, the surviving party can testify, as the accused did testify in this case, in her own behalf, though the mouth of the other is closed by death.

Upon an examination of the exceptions relied on, we cannot see that any error was committed by the presiding judge.

No error.